IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **99-K-1481**

**JODY BRAMMER-HOELTER, LAURA KILDUFF, MELISSA PERRY, AMY SULZBACH, SHELLEY CREWS, AND BONNIE GOULD,**

    Plaintiffs,

v.

**TWIN PEAKS CHARTER ACADEMY, ST. VRAIN VALLEY SCHOOL DISTRICT RE-1J, AND DOROTHY MARLATT,**

    Defendants.

**OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Kane, J.

## I. Introduction

In this wrongful termination action, Defendants Twin Peaks Charter Academy ("School"), St. Vrain School District Re-1J ("School District"), and Dorothy Marlatt[1] move for summary judgment on the remaining federal and state claims brought against them by Plaintiffs Jody Brammer-Hoelter, Laura Kilduff, Melissa Perry, Amy Sulzback, Shelly Crews, and Bonny Gould (collectively "Teachers"), all former employees of the School.

---

[1] Brian Cox, former chairman of the School's Board of Directors, was dismissed as a party Defendant in a January 25, 2000 Order dismissing all claims challenged by the Defendants in their Motion to Dismiss. 81 F. Supp. 2d 1090 (D.Colo. 2000).

1

The Teachers bring their federal claims under 42 U.S.C. § 1983 seeking damages for the alleged infringement of their rights under the First and Fourteenth Amendments to the U.S. Constitution. First, the Teachers contend that the School, the School District, and Martlett deprived them of their First Amendment right to engage in speech at work or related to work. Second, the Teachers insist the School and the School District violated the Fourteenth Amendment by depriving them of certain property interests without procedural due process. Regarding their state claims, the Teachers assert that the School and the School District breached their employment contracts and should be estopped from denying the implied terms of those contracts.

## II. Background

The following facts are undisputed unless otherwise indicated.

Twin Peaks Charter Academy, a charter school in Longmont, Colorado, was created in 1997 under the Colorado Charter School Act, C.R.S. § 22-10.5-101 et seq., and by contract with the St. Vrain Valley School District Re-1J. Before it opened for the 1997-98 school year, the School hired Dorothy Marlatt as its administrator. It also hired several teachers, including Jody Brammer-Hoelter, Laura Kilduff, Melissa Perry, Amy Sulzbach, Shelly Crews, and Bonny Gould. At that time, each of the Teachers signed an identical, annually-renewable employment contract. (Pls.' Opp'n to Summ. J., Ex. 1.) Each of these contracts was renewed for the 1998-99 school year.

By the beginning of the 1998-99 school year, the Teachers contend they were growing concerned with how the School was being operated. In particular, they were dissatisfied with the conduct of Ms. Marlatt, the School's administrator. (E.g., Leeds Dep. 56:13-15.) Soon after, the Teachers began discussing these issues at social gatherings outside of work. (Brammer-Hoelter Dep. 26:1-21.) In October 1999, the Teachers held the first of many off-campus meetings with parents and students regarding the course of the School and to construct ways to change it. (Brammer-Hoelter Dep. 95:3-4.) The Teachers' biggest meeting had about forty attendees. (Perry Dep. 32:5-7.)

On either February 28 or March 1, 1999, each of the Teachers sent a written two weeks' notice of resignation to the School's Board of Directors ("Board"). (Defs.' Br. Supp. Summ. J. Ex. 1, Attach. E.) The following day, the Board called an executive session to discuss the mass resignation. During that meeting, one Board member suggested that Ms. Marlatt might be the source of the Teachers' dissatisfaction. Upon hearing this, Ms. Marlatt handed a written resignation to the Board's President and walked out of the meeting. With the School now short of six teachers and its administrator, the Board met again on March 4, 1999, to talk about finding replacements for the departing employees.

The next day, each of the Teachers attempted to rescind her resignation by giving the Board a one- or two-sentence letter explaining her change of heart.[2]

---

[2] The rescission letters submitted to the Board by Ms. Brammer-Hoelter, Ms. Kilduff, Ms. Perry, and Ms. Sulzbach read:
After a week of consideration, I believe that it is in the best interest of my students that I remain an employee of TPCA [Twin Peaks Charter

(Defs.' Br. Supp. Summ. J. Ex. 1, Attach. F.) On March 6, 1999, however, the Board, after holding yet another executive session, announced to a cafeteria full of parents and teachers that the Teachers had resigned. (Pls.' Br. in Opp'n to Summ,. J., Ex. 11.) The Board also announced its intention to find qualified replacements for the teachers and administrator. The Board did not announce the Teachers' attempt to rescind their resignations. (Zlomke Aff. ¶ 11)

The following week, during a regular Board meeting, one Board member moved to retain the Teachers. The motion failed on a 5-2 vote. Later that night, the Board received a letter from each of the Teachers explaining that, based on the Board's failure to accept their resignations, they considered their resignations rescinded.[3] Accordingly, the Teachers informed the Board, they would report for work as usual on March 15, 1999, the first Monday after the expiration of the resignations' two weeks' notice period. In addition to submitting this letter to the

---

Academy]. Therefore, I hereby rescind my resignation dated March 1, 1999.

Ms. Crews' letter read:
Having reconsidered the damage my resignation may do to the students at TPCA, I hereby wish to rescind my resignation.

Ms. Gould's letter read, simply:
    I hereby rescind my resignation letter dated March 1, 1999.
Defs.' Br. Supp. Summ. J. Ex. 1, Attach. E.

[3]  Ms. Brammer-Hoelter wrote:

Please be informed that, because no action has been taken on your part, I consider my resignation to be rescinded, as per my letter dated March 6, 1999. I continue to be an employee of Twin Peaks Charter Academy, and intend to report for work as usual on March 15, 1999.

Defs.' Br. Supp. Summ. J. Ex. 10, Attach. A.

4

Board, the Teachers filed grievances against the Board for failing to acknowledge or accept their rescissions. (Defs.' Br. Supp. Summ. J. Ex. 10, Attach. C.)

On March 13, 1999, the School's acting administrator had a letter hand-delivered to each of the Teachers. (Zlomke Aff. ¶ 11.) The letter informed the Teachers that the School neither expected nor permitted them to report for work the following Monday, March 15, 1999. (Pls.' Opp'n to Summ. J. Ex. 11.) About two months later, each of the Teachers received another letter stating that the Board had denied their grievances. (Defs.' Br. Supp. Summ. J. Ex. 1, Attach. H.) The Teachers then filed this wrongful termination action.

### III. Standard of Review

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Application of this standard requires evidence to be viewed and reasonable inferences to be drawn in the light most favorable to the nonmoving party. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).

The moving party bears the initial burden of showing both that there is an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. In so doing, the moving party need not negate the claims made by the nonmoving party. Id. If the moving party adequately supports its motion,

the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position is insufficient to create a dispute of fact that is 'genuine.'" Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997).

### IV. Merits

As the School, the School District, and Ms. Marlatt urge, none of the Teachers claims should survive summary judgment. First, the Teachers claim that the School, the School District, and Ms. Marlett deprived them of their First Amendment right to free speech by retaliating against the Teachers for holding off-campus meetings to discuss certain school matters. The Teachers erroneously conclude, however, that the Board's refusal to rescind the Teachers' voluntary resignations constituted retaliatory action. Even assuming the occurrence of retaliatory action, there is no evidence that the Teachers' speech dealt with matters of public concern. Next, the Teachers claim that the School and the School District deprived them of their right to procedural due process, as guaranteed by the Fourteenth Amendment, by terminating their employment without just cause. But, the record does not support the Teachers' theory that their employment contracts expressly or impliedly created a protected property interest in their continued employment, especially after they submitted letters of resignation to the Board. Finally, the Teachers claim that their employment contracts were breached

when the Board refused to retain the Teachers without having accepted their resignations. Although the Teachers insist that the Board's refusal to continue to employ the Teachers constituted termination of their employment, their proposition is neither supported by the express terms of the employment contract nor sustainable by the implied terms of some other inferable promise. Each of these arguments is discussed, in turn, below.

### A. First Amendment Retaliation Claim.

First, the Teachers claim that the School, the School District, and Ms. Marlett deprived them of their First Amendment right to free speech by retaliating against the Teachers for holding off-campus meetings to discuss certain school matters. The Teachers erroneously conclude, however, that the Board's refusal to rescind the Teachers' voluntary resignations constituted retaliatory action. Even assuming the occurrence of retaliatory action, there is no evidence that the Teachers' speech dealt with matters of public concern.

The First Amendment protects a public employee's freedom of expression by prohibiting a public employer from conditioning employment in a way that impinges on that freedom. Hulen v. Yates, 322 F.3d 1229, 1237 (10th Cir. 2003). In order to prevail on such a retaliation claim, a plaintiff must establish that: (1) the speech involved a matter of public concern; (2) the employee's interest in engaging in the speech outweighed the employer's interest in regulating the speech; and (3) the speech substantially motivated the employer's decision to take

7

adverse employment action against the employee. Maestas v. Segura, 416 F.3d 1182, 1187 (10th Cir. 2005). Of course, a plaintiff who cannot show that he or she suffered an adverse employment action has no cause of action. See Petersen v. Utah Dep't of Corrs., 301 F.3d 1182, 1189-91 (10th Cir. 2002).

Here, the Teachers assert myriad reasons why their speech was a matter of public concern and then simply conclude that Defendants' actions "in involuntarily terminating plaintiffs cannot stand constitutional muster." (Pls.' Opp'n at 41-43.) In doing so, the Teachers never deal squarely with the issue of whether and how their own resignations could constitute an adverse employment action. Despite the omission of such vital analysis in this section of their 131-page brief, the Teachers suggest an argument for an adverse employment action in the cursory discussion of their constructive discharge claim by contending that working conditions at the School were "intolerable." (See id. 94-96.)

A public employee who resigns may sustain a First Amendment retaliation claim if the employee's resignation qualifies as a constructive discharge. See Jones v. Fitzgerald, 285 F.3d 705, 713-715 (8th Cir. 2002). But, as discussed below, the Teachers' constructive discharge claim lacks legal merit because there is no evidence of intolerability. (See infra 11-12.) Hence, the Teachers, who voluntarily resigned from their jobs, cannot show that they suffered an adverse employment action.

Even assuming the Teachers had shown an adverse employment action, moreover, they have failed to establish the discussions were of public concern.

There is a difference between comments made as a citizen regarding matters of public concern and those made as an employee regarding matters of personal interest. <u>Connick v. Myers</u>, 461 U.S. 138, 147 (1983). Speech that relates to any matter of political, social, or other concern to the community is of public concern. <u>Id</u>. at 146. But, the Tenth Circuit construes "public concern" narrowly. <u>Flanagan v. Munger</u>, 890 F.2d 1557, 1563 (10th Cir. 1989). This Circuit has held that grievances about internal departmental affairs were not of public concern, <u>Hom v. Squire</u>, 81 F.3d 969, 974 (10th Cir. 1996); that comments regarding a dispute over the terms of employment were not of public concern, <u>Lancaster v. Indep. Sch. Dist. No. 5</u>, 149 F.3d 1228, 1233-34 (10th Cir. 1998); and that a letter airing workplace frustration was not of public concern, <u>McEvoy v. Showmaker</u>, 882 F.2d 463, 466 (10th Cir. 1989).

The Teachers contend they were not motivated by personal interest, but rather by a "sincere desire to help change the course of a charter school that was not living up to its Charter contract or Charter mission." (Pls.' Opp'n to Summ. J. 117-18.) As support for their contention, the Teachers enumerate 52 topics they discussed during their off-campus meetings. (<u>Id</u>. at 41-43.) This list, however, over-generalizes the evidence and does not, by itself, demonstrate that the Teachers' discussions were of public concern.

For example, the Teachers state that they discussed the School's budget and accumulated budget reserve. (<u>Id</u>. at 41.) By mentioning such topics, the Teachers imply that their discussions revolved around a matter of concern to the community,

9

that is, how the School was spending its public funds. Yet, a more careful review of the evidence reveals that the Teachers' discussions about the School's finances focused on their salaries and classroom budgets. (Sulzbach Dep. 25:3-14, June 1, 2000.) The Teachers also state that they discussed the School's curriculum. (Pls' Opp'n to Summ. J. 41.) This implies that the Teachers were talking about what they were teaching to the students, when really they were talking about how to handle students who failed to grasp the material being taught. (Crews Dep. 13:16-24, May 26, 2000.)

Although it is easy to glean that the Teachers were upset by the way the School was being run and wanted to affect some type of change, it is more difficult to discern how the Teachers' interests were more than personal. Ultimately, the Teachers wanted to make the School a better place to work; this end is not a matter of public concern.[4] Summary judgment is appropriate on this claim.

### B. Fourteenth Amendment Deprivation of Due Process Claim.

Next, the Teachers claim that the School and the School District deprived them of their right to procedural due process, as guaranteed by the Fourteenth Amendment, by terminating their employment without just cause. But, the record does not support the Teachers' theory that their employment contracts expressly or

---

[4] Moreover, the Teachers have presented no evidence to prove either that the employee's interest in engaging in the speech outweighed the employer's interest in regulating the speech (the second required element of this claim), or that the speech substantially motivated the employer's decision to take adverse employment action against the employee (the third required element of this claim).

impliedly created a protected property interest in their continued employment, especially after they submitted letters of resignation to the Board.

The Fourteenth Amendment provides that no state shall "deprive any person life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. This Amendment's procedural protection safeguards, among other things, "the security of [property] interests that a person has already acquired in specific benefits" (e.g., interest in continued employment). Board of Regents v. Roth, 408 U.S. 564, 576 (1972); see Derstein v. Kansas, 915 F.2d 1410, 1413 (10th Cir. 1990). Naturally, the first step in such a due process inquiry is to determine whether the plaintiff acquired a legitimate claim of entitlement to a particular benefit. See Roth, 408 U.S. at 577. A plaintiff who brings a 42 U.S.C. § 1983 action cannot maintain a Fourteenth Amendment claim without showing that he or she held a constitutionally-protected property interest. American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49 (1999).

A judge may decide as a matter of law whether a plaintiff has a property interest in continued employment. Driggins v. City of Oklahoma City, 954 F.2d 1511, 1512 (10th Cit. 1992). In making that decision, the judge must look to state law. Lighton v. Univ. of Ut., 209 F.3d 1213, 1221 (10th Cir. 2000). These state law sources include statutes, municipal charters or ordinances, and express or implied contracts. Kingsford v. Salt Lake City Sch. Dist., 247 F.2d 1123, 1128 (10th Cir. 2001).

In Colorado, a public employer creates a property interest in continued employment when it conditions discharge on a "for cause" basis. Ness v. Glasscock, 781 P.2d 137, 139 (Colo. App. 1989). A public employee, then, possesses a property interest in continued employment until there is "cause" to dismiss him or her. Ellis v. Lakewood, 789 P.2d 449, 452 (Colo. App. 1989). A public employee who voluntarily resigns, however, relinquishes his or her protected property interests upon resignation. Parker v. Bd. of Regents of Tulsa Junior Coll., 981 F.2d 1159, 1162-63 (10th Cir. 1992).

Before the 1998-99 school year, each of the Teachers renewed her employment contract with the School. (See, e.g., Defs.' Br. Supp. Summ. J. Ex. 2.) The parties disagree about whether the terms of these contracts, which were identical, conditioned discharge on a "for cause" basis or established employment "at will." The Teachers claim they relied on the following clause contained under the contract's "Term of Employment" section (Pls.' Opp'n to Summ. J. 121): "Notwithstanding the Effective Period of this agreement, the Teacher may be terminated by the Academy Board, provided just cause is given" (id. at Ex. 1). The School and School District point to another clause in the "Entire Agreement" section (Defs.' Br. Supp. Summ. J. 10): "The Teacher is considered an at-will employee in the sense that this agreement may be terminated at any time by either of the Parties, provided that a minimum of two (2) week's [sic] written notice is given" (Pls.' Opp'n to Summ. J. Ex. 1).

Under Colorado law, ambiguities in contracts can be construed against the drafter. Patterson v. Gage, 16 P. 560, 562 (Colo. 1888); Quad Constr. Inc. v. Wm. A. Smith Contracting Co., 534 F.2d 1391, 1394 (10th Cir. 1976). In this case, such construction leads to the conclusion that the employment contract conditioned discharge on a "for cause" basis, creating a protected property interest in continued employment. Nonetheless, as discussed below, the Teachers voluntarily resigned from their jobs. (See infra 12-15.) Thus, any property interest the Teachers might have had was relinquished at the moment of resignation.

Regardless of whether the Teachers had a protected property interest in continued employment, their due process claim fails as a matter of law because they cannot prove they were constructively discharged. To prove that they were constructively discharged, the Teachers must establish sufficient evidence that the School deliberately allowed the working conditions to become so intolerable that they had no other choice but to resign. Irving v. Dubuque Packing Co., 689 F.2d 170, 172 (10th 1982); Wilson v. Bd. of County Comm'rs, 703 P.2d 1257, 1259 (Colo. 1985). The Teachers claim that both Ms. Marlatt and the Board made working conditions at the School intolerable. (Pls.' Opp'n to Summ. J. 95.) However, the averred wrong each of them claims to have suffered was the Board's refusal to rescind their resignations. It is antithetical for the Teachers to argue on the one hand that working conditions at the School were so intolerable that they had no choice but to quit, but on the other that they were wronged because the

13

School would not accept their requests to return to work. Summary judgment is granted on this claim.

### C. Breach of Contract and Estoppel Claims.

Finally, the Teachers claim their employment contracts were breached when the Board refused to rescind their resignations. Although the Teachers insist that the Board's refusal to continue to employ the Teachers constituted termination of their employment, their proposition is neither supported by the express terms of any contract nor sustainable by the implied terms of some other inferable promise.

A public employee may resign from his or her job at any time. Britton v. City of Trinidad, 687 P.2d 523, 526 (Colo. App. 1984). Unless a valid enactment or contract provides otherwise, an employer need not accept an employee's resignation to make it effective. Id. Thus, an employee's resignation takes effect upon the date specified in the resignation. Id. After a resignation takes effect, it cannot be rescinded. Id. These legal rules are to be distinguished from those that, by statute, require formal acceptance of the resignation of an appointed public employee. Trustees of State Normal Sch. v. Wightman, 25 P.2d 193, 195 (Colo. 1933).

The parties disagree about when, if ever, the Teachers' resignations took effect. The Teachers claim that the School did not have a resignation policy of its own. (Pls.' Opp'n to Summ. J. 99.) Hence, they contend, the School was required to abide by the applicable resignation policy of the School District.. (Id. at 101.)

Under the School District's policy, the Teachers' argument goes, their resignations were effective only upon acceptance by the School District's assistant superintendent for human resources. (Id. at 101) Because this assistant superintendent never accepted the resignations, the Teachers conclude, they did not quit their jobs, but were, instead, fired in breach of their employment contracts. (Id.)

The School and School District, on the other hand, argue that each of the Teachers' annually renewable employment contracts plainly stated the School's resignation policy.[5] (Defs.' Br. Supp. Summ. J. 12.) That policy, they claim, permitted the Teachers to terminate their employment unilaterally (id. at 12); that is, the Board did not need to accept the Teachers' resignations in order for them to take effect (id.). The School and School District conclude, therefore, that the Teachers terminated their own employment pursuant to their employment contracts. (Id.)

Even though it is disputed, which policy controlled the Teachers' resignations is inconsequential because the Teachers have both misread and misapplied the policy on which they rely. Even if it were to be determined that the School District's resignation policy controlled the resignations, there is still no evidence that the Teachers' resignations were ineffective until accepted by the School. The School District's resignation policy stated in pertinent part:

---

[5] The relevant provision reads: "The Teacher is considered an at-will employee in the sense that this agreement may be terminated at any time by either of the Parties, provided that a minimum of two (2) week's [sic] notice is given." (Defs' Br. Supp. Summ. J. Ex. 2.)

15

> [A] teacher or administrator may cancel a contract . . . during an academic year by giving at least 30 days' written notice, or at any time upon the district's acceptance of the staff member's resignation. The assistant superintendent for human resources is authorized to immediately accept the resignation of a staff member. . . ."

(Pls.' Opp'n to Summ. J. Ex. 9.) When read as part of the entire resignation policy, the clause regarding the power of the assistant superintendent for human resources is permissive, not exclusive. To put it another way, the policy does not make the assistant superintendent for human resources the clearinghouse for all employee resignations. Nor does the policy require acceptance of resignations during an academic year. Instead, the policy merely informs employees that they may tender a letter of resignation to the assistant superintendent of human resources instead of, presumably, to their immediate supervisor.

In the alternative, the Teachers insist that the Board's "course of dealing" created an expectation that the resignations would not take effect until the Board accepted them. (Pls.' Opp'n to Summ. J. 101.) The Teachers exaggerate the Board's prior actions, however, and thus fail to demonstrate the elements of what is essentially a promissory estoppel claim. Here, the elements are: (1) that the Board's prior actions constituted a promise on behalf of the School and the School District to the Teachers regarding the School's resignation policy; (2) that the School and School District should have reasonably expected that the Teachers

16

would interpret the Board's prior actions as establishing an acceptance requirement regarding resignations; (3) that the Teachers reasonably relied on the Board's prior actions to their detriment; and (4) that justice demands enforcement of the established promise.  See Berg v. State Bd. of Agric., 919 P.2d, 254, 259 (1996).

In support of their claim, the Teachers contend it was the Board's procedure to formally accept resignations by vote.  (Pls.' Opp'n to Summ. J. 101.)   The only evidence the Teachers have, however, contradicts their assertion: Ms. Brammer-Hoelter assumed that the Board voted to accept resignations (Brammer-Hoelter Dep. 48:10-17, May 19, 2000); and Ms. Kilduff was unaware of how the Board handled resignations (Kilduff Dep. 65:13-19).  The Teachers also note that the Board had allowed an employee – Ms. Marlatt, curiously enough – to withdraw a completely unrelated resignation in August 1997.  (Pls.' Opp'n to Summ. J. 101.) The heavy reliance placed on this evidence obscures the threshold question of its relevance to the matters at hand.  In the letter requesting the withdrawal of her resignation, Ms. Marlatt acknowledged that her resignation had taken effect and left acceptance of her withdrawal to the Board's discretion.  (Pls.' Opp'n to Summ. J. Ex. 43.)  This piece of evidence does not address the effectiveness of Ms. Marlatt's resignation and is inapplicable to the Teachers' argument.

Neither the Board's previous actions nor the School District's policy, then, served as an enactment or contract, either express or implied, requiring acceptance of the Teachers' resignations.  The resignations were, therefore, effective as a matter of law upon receipt by the Board.  Because the Teachers could not rescind

their resignations after that time, the Board's failure to retain the Teachers did not constitute a breach of the Teachers' employment contracts.  Summary judgment is granted on this claim.

Because none of the Teachers' underlying claims are valid, this order need not discuss the issues raised in the School District's separate motion for summary judgment.

The School's Motion for Summary Judgment is **GRANTED**.  The District's Motion for Summary Judgment is **DENIED** as **MOOT.**  Plaintiffs' claims against Defendants are resolved against Plaintiffs.  Judgment shall enter accordingly.

Dated this 28th day of March, 2006.

      **s/John L. Kane**
      SENIOR U.S. DISTRICT JUDGE