IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **99-cv-01481-JLK**

**JODY BRAMMER-HOELTER,**
**LAURA KILDUFF,**
**MELISSA PERRY,**
**AMY SULZBACH,**
**SHELLEY CREWS, and**
**BONNIE GOULD,**

      Plaintiffs,

v.

**TWIN PEAKS CHARTER ACADEMY,**
**ST. VRAIN VALLEY SCHOOL DISTRICT RE-1J, and**
**DOROTHY MARLATT**

      Defendants.

_____

## SECOND ORDER ON SUPPLEMENTAL MOTIONS FOR SUMMARY JUDGMENT AFTER REMAND

_____

Kane, J.

      This is the second order on Defendants' Supplemental Motions for Summary Judgment in two related employment actions before me on remand from the Tenth Circuit Court of Appeals. The first Order, issued June 11, 2008, granted Defendants' motions in part and denied them in part as to the 42 U.S.C. § 1983 claims of Plaintiff Dawn Dillon, a former staff member and paraprofessional at Twin Peaks Charter Academy who sued the Academy and the St. Vrain Valley School District after the Academy board of directors

refused to renew her employment contract.[1]  The instant Order focuses on the lawsuit brought by six former Academy teachers ("Teachers") who sued the Academy, District and Academy principal Dorothy Marlatt after the Academy board of directors refused their attempts to rescind letters of resignation they themselves had delivered to the board or to re-hire them after they resigned.   Like Dillon, the Teachers claimed Defendants' actions were the result of unlawful efforts to restrain their speech and prevent them from meeting to discuss matters of public interest, and then to retaliate against them for doing so.

After an appeal and reversal, in part, of my original decision granting Defendants' motions for summary judgment in toto, the Court revived limited aspects of Plaintiffs' First Amendment retaliation claims and remanded the case for further consideration on Defendants' summary judgment motions in light of that determination.  *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192 (10th Cir. 2007) (affirming entry of summary judgment on Plaintiffs' due process and state common law claims but determining four of twelve categories of Plaintiffs' asserted speech and association interests related to matters of public concern sufficient to give rise to inference, at least, that constitutional deprivation had occurred).  Because Plaintiffs' prior restraint allegations had not been independently addressed in my original ruling, the revival of Plaintiffs' First Amendment claims necessitates consideration of that claim on remand as

---

[1]     *See* slip op., No. 99-cv-02462 (D. Colo. June 11, 2008)(on remand from the Tenth Circuit Court of Appeals' decision in *Dillon v. Twin Peaks Charter Academy*, 2007 WL 2007549 (10th Cir. July 12, 2007)(unpublished Order and Judgment)).

well.

Accordingly, the scope of my duties on remand involves (1) consideration of the Teachers' evidence regarding "gag orders" issued by the Academy and Dr. Marlatt to determine whether they give rise to an additional theory of constitutional deprivation based on a theory of prior restraint and (2) consideration of Defendants' § 1983 defenses/theories of nonliability to Plaintiffs' prior restraint and/or First Amendment retaliation claims, including (a) Defendant Marlatt's defense of qualified immunity and (b) the Academy and District's arguments regarding a lack of evidence to support a finding of municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny.

After supplemental briefing and oral argument, my findings and conclusions are set forth below.

## FACTS AND PROCEDURAL HISTORY.

The facts and procedural history of these cases have been amply described in the various rulings to date and the Tenth Circuit's rendition of them on appeal is incorporated here by reference. *See Brammer-Hoelter*, 492 F.3d at1198-1201. Restated briefly, the facts relevant to the Teachers' § 1983 prior restraint claim and Defendants' qualified and municipal liability defenses on remand are as follows:

The Academy operates as a Colorado charter school and is located within St. Vrain Valley School District RE-1J ("the District"). The Teachers were hired and began working for the Academy pursuant to written contracts when it first opened its doors in

the fall of 1997.  Plaintiffs received positive performance reviews their initial year of employment, but early on developed "concerns and grievances" regarding the operation, management, and mission of the Academy, as well as the performance of principal Dorothy Marlatt.  The Teachers began to meet off-campus after hours to discuss these concerns at restaurants, each others' homes and at least once at a local church.

In response, the Academy developed a one-page letter (to which the parties refer as a "code of conduct"), which it required employees to sign before the 1998-99 school year acknowledging "the severe and destructive consequences of misconduct which negatively affect [sic] [the Academy]" and eliciting a series of "promise[s]" aimed at combating it. *See* Ex. 79, Pls.' Opp'n to Defs' Mots. Summ. J.  One such promise was "to . . . . refrain from actions or behavior harmful/hurtful to others . . . including malicious gossip and similar activities"[2]  Each Teacher signed the "code," but added it to the list of concerns about which they continued to meet.  In response, Dr. Marlatt convened a mandatory faculty meeting and directed teachers not to speak about Academy matters outside of work, even to parents, and expressed her "preference" that teachers not even associate with each other outside of school.

Despite Dr. Marlatt's directives, the Teachers continued to meet off campus to express their concerns. Some meetings, approximately 20 to 25 in all, were attended by

_____

[2]       Employees also promised to "observe, support and implement" school policies; to "hold in confidence and protect from compromise all proprietary school matters regardless of the manner by which I become aware of them"; and to "bring matters of misconduct to the attention of the Administrator and/or Board of Directors for resolution as appropriate."  (Ex. 79.)

parents and other members of the public.  Dr. Marlatt informed the Board about the meetings, and compiled a list of suspected participants, which included Plaintiffs.  In response, the Board invited the Teachers to communicate their grievances to the Board directly, which the Teachers contend they did to no avail.

Marlatt's 1998-99 performance reviews of Plaintiffs were considerably less favorable than the previous year's reviews.  According to Plaintiff Kilduff, when she asked Marlatt about her review Marlatt told her "the gossip has got to stop."  The Teachers all assert Marlatt had grown increasingly hostile toward them over the course of the year until, on March 1, 1999, each submitted a letter of resignation to the Academy.

The Academy's Board of Directors held a series of meetings to discuss the resignations beginning the following day.  After a Board member's comment at that meeting prompted Dr. Marlatt to resign, the Teachers changed tack and attempted to rescind their resignations.  The Board refused to accept their rescissions.

On March 12, 1999,  the Teachers' last day of work, each submitted a formal grievance to the Board based on the Board's refusal to allow them to rescind their resignations.  The Board notified the Teachers in May that their grievances had been rejected as untimely filed.  Five of the Teachers re-applied for positions at the Academy, but none received a response.  Their applications were later found in the cabinet of the Academy administrator who replaced Dr. Marlatt.  The Teachers contend this is evidence they had been "blacklisted" from further employment.  Pls.' Opp'n to Def. St. Vrain Valley Sch. Dist.'s Supplemental Br. Supp. Summ. J. at 19.

**<u>MERITS</u>**.

On appeal, the Tenth Circuit rejected Plaintiffs' state law breach of contract/constructive discharge claims and affirmed determinations that the Teachers had no constitutional property interest in their continued employment and suffered no deprivations of due process in the Board's refusal to rescind their resignations or to rehire them. *Brammer-Hoelter*, 492 F.3d at 1209-11. With respect to the Teachers' 42 U.S.C. § 1983 theories of relief premised on First Amendment deprivations, however, the Court determined the Teachers had articulated a limited First Amendment retaliation claim and ruled their prior restraint claim required independent consideration on remand.[3] As a result, the Teachers' sole remaining claims on remand are asserted under 42 U.S.C. § 1983 and seek compensation for two types of First Amendment violations: (1) that Marlatt's directives and/or the Academy's "code of conduct" constituted prior restraints on their protected speech; and (2) that Dr. Marlatt retaliated against them for exercising protected speech and association rights in violation of the First Amendment.

The Tenth Circuit made a series of rulings on appeal critical to the issues before me on remand. Specifically, the Court applied the first three steps of the *Garcetti-Pickering* analysis[4] to limit significantly the categories of the Teachers' speech for which

---

[3]     "The first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan*, 443 U.S. 137, 140 (1979), *applied in Graham v. Independent School Dist. No. I-89*, 22 F.3d 991, 993 (10th Cir. 1994).

[4]     *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006)(supplementing the analysis articulated originally in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). The five-step *Garcetti/Pickering* analysis applies to freedom of speech retaliation claims specifically, but provides

any First Amendment protection – on either a prior restraint or retaliation theory of deprivation – exists in this case. By excluding all but four categories of the Teachers' speech as unprotected matters that could be freely regulated by the Academy as employer, the Tenth Circuit limited Plaintiffs' prior restraint and retaliation claims under 42 U.S.C. § 1983 to claims that Dr. Marlatt and/or the Academy and District issued prior restraints on, or retaliated against Teachers for speaking about, four discreet matters of public concern.

In reaching this conclusion, the Court ruled that "nearly all" of the speech forming the basis of the Teachers' claims was made pursuant to their official duties, and as such was not subject to First Amendment protection in the first instance. Because regulation of such speech "'simply reflects the exercise of employer control over what the employer itself has commissioned or created,'" the Court held the Academy could "freely regulate[]" it without offending the First Amendment or subjecting itself to § 1983 liability. *Brammer-Hoelter*, 492 F.3d at 1202-04 (quoting *Garcetti*).

---

the means generally for determining when employee speech is subject to First Amendment protection under a prior restraint or retaliation theory of relief. It involves (1) a determination of whether the employee spoke pursuant to his official duties (which speech does not trigger First Amendment protection) or as a citizen; (2) if the employee spoke as a citizen rather than pursuant to official duties, whether the subject of the speech was a matter of public concern (if the speech is not, then it is unprotected and the inquiry ends); (3) if the employee speaks as a citizen on a matter of public concern, whether the employee's free speech interest outweighs the interest of the state as employer (if it does not, then the inquiry ends there); (4) if the employee's interest does outweigh the employer's, whether the employee's speech was a motivating factor in an adverse employment action; and (5) if the employee's protected speech was such a factor, whether the employer can demonstrate that it would have taken the same action against the employee regardless of the protected speech. *Brammer-Hoelter*, 492 F.3d at 1202-03. The first three steps are to be resolved by the court as a matter of law, while the last two are ordinarily for the trier of fact. *Id.* at 1203.

Of the handful of matters the Court determined Teachers discussed as private citizens rather than as teachers engaged in official duties, the Court agreed most involved internal personnel and workplace disputes that were not matters of public concern. *Brammer-Hoelter*, 492 F.3d at 1205-06. Ultimately, the Court identified four limited categories of the Teachers' speech that did involve matters of public concern and were, therefore, subject to the remaining steps of *Garcetti-Pickering*: (1) the August 1998 "code of conduct" letter and whether the Academy could restrict the Teachers' speech in that manner; (2) Dr. Marlatt's directives that they neither meet or discuss school matters off school grounds; (3) whether the Academy's charter should be renewed; and (4) the then-upcoming Board elections and whether alleged wrongdoers on the Board should be reelected.[5] Based on the law of the case, these speech categories alone form the basis for Plaintiffs' First Amendment claims on remand.

## A. **First Amendment retaliation.**

While my reading of the Tenth Circuit's decision did not preclude Defendants from reasserting their entitlement to summary judgment on the Teachers' First

---

[5] Proceeding to the third prong of the *Garcetti-Pickering* analysis, the Tenth Circuit ruled based on the Academy's failure to present any evidence in support of its interest in regulating the Teachers' protected speech that Plaintiffs' free speech interests outweighed Defendants' interests in managing the work environment. *Id.* at 1207. Finding evidence to support the conclusion that the Teachers' speech was a "substantial or motivating" factor in an adverse employment action, *id.* at 1208, the Court of Appeals concluded Plaintiffs' free speech retaliation claim "survives summary judgment at this point, but only with regard to the four specified remaining matters." *Id.* Any final determination that the Academy would have disciplined the Teachers and refused to allow them to rescind their resignations irrespective of the exercise of their free speech and association rights would presumably be for the trier of fact.

Amendment retaliation claim, *see Brammer-Hoelter*, 492 F.3d at 1208 (Defendants' failure to proffer alternative reason for adverse employment action precluded finding on fifth prong of *Garcetti-Pickering* analysis on summary judgment), the parties proceeded as if it did and I will not make the arguments for them. Based on the Tenth Circuit's identification of four subject matters about which Teachers' met that were matters of public concern and its determination that certain Defendants' had failed to meet their evidentiary burdens on the remaining *Garcetti-Pickering* balancing factors, I conclude the Teachers have satisfied the first inquiry in a 42 U.S.C. § 1983 analysis and established in their First Amendment retaliation claim the deprivation "of a right secured by the Constitution and laws." *See Baker*, 443 U.S. at 140. Before proceeding to Defendants' defenses or other assertions of nonliability under § 1983 for such a deprivation, I address the Teachers' separate and independent theory of First Amendment deprivation, namely their claim that either the "code" or Dr. Marlatt's directives also constituted an unlawful prior restraint under the First Amendment.

**B. <u>Prior Restraint</u>.**

Prior restraint claims are distinct from First Amendment retaliation claims because the latter takes place in response to protected speech while the former chills protected speech "before it happens." *Brammer-Hoelter*, 492 F.3d at 1209(citing *Arndt v. Koby*, 309 F.3d 1247, 1251 (10th Cir. 2002)(§ 1983 action against Boulder, Colorado police department based on police chief's order prohibiting officers investigating child's murder from speaking to media) and *United States v. Nat'l Treasury Employees Union*

("*NTEU*"), 513 U.S. 454 (1995)(striking down Ethics in Government Act provision prohibiting all federal employees from receiving honoraria for speeches, appearances or articles of any kind under *Pickering* on grounds that it unduly burdened over 1.6 million federal employees' rights to speak not as employees to speak on matters related to their jobs but as citizens on matters of public concern)). Because I did not address Plaintiffs' then-relatively undeveloped prior restraint claim in my original ruling on summary judgment,[6] the Tenth Circuit, without any additional comment, remanded it "for a determination under *NTEU* and our related precedent." *Id.*

While it is well established that "'a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression,'" the First Amendment "'does not apply with full force'" when the government acts as employer. *Arndt*, 309 F.3d at 1251 (citations omitted)(applying *NTEU*). A governmental employer "'may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large.'" *Id.* (quoting *NTEU* at 465).

The threshold inquiry in analyzing the constitutionality of any governmental restriction of employee speech is whether the particular speech at issue was on a matter of

---

[6]    I note no independent prior restraint claim appears in either Plaintiffs' original or Amended Complaints. The claim essentially evolved from Plaintiffs' assertions that Marlatt's verbal directives were tantamount to a "gag order" issued in retaliation for the Teachers' exercise of their protected free speech and association rights. On appeal, Plaintiffs broadened their "gag order" claims to include the "code of conduct" letter and the promise to "refrain from . . . malicious gossip and similar activities" it extracted.

public concern. *Arndt*, 309 F.3d at 1252. If it was not, then no balancing of interests is necessary. *See id.* (JonBenet Ramsey murder investigation detective's desire publicly to rebut media criticism to clear her reputation was personal rather than public concern such that police chief's order prohibiting his officers from speaking to media did not trigger *NTEU/Pickering* First Amendment protection). If it was, then restraints on such speech are assessed "by balancing 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 1252 (quoting *Pickering*, 391 U.S. at 568)).

I have already ruled that by definition "gossip" and "malicious gossip" are matters of personal, and not public, concern that may be freely regulated by an employer without triggering application of the *NTEU/Pickering* balancing test. *See* Dillon Order at 5-6. The Tenth Circuit, however, identified four categories of the Teachers' speech that were more than mere "gossip" or simply personal in nature and were, instead, of public concern. The question for purposes of Plaintiffs' prior restraint claims is whether the "code" or Dr. Marlatt's directives restricted any of the Teachers' protected speech in those categories. It is here that their evidence falls short.

Nowhere in the record do Plaintiffs identify *any* actual, prospective speech that was chilled as a result of the "code," much less speech within any of the protected categories identified by the Tenth Circuit. At most, the Teachers testified they did not "like the fact that [the code] restricts speech." *See* Pls.' Ex. 26, Kilduff Dep.102:4-5. In

reality, the "code" performed the opposite function – fomenting rather than chilling the Teachers' protected speech and actually becoming one of the four subject matters to which First Amendment rights attached at all.  Because the "code" restrained only that speech that is fully subject to regulation by employers (i.e., gossip) and because Plaintiffs identify no speech within the four protected categories that was chilled as a result of it, the "code" forms no basis for a viable prior restraint claim.[7]

With respect to Dr. Marlatt's "gag order" directive and the question of whether they chilled speech within the protected categories, however, the evidence is less clear. The Teachers still fail to identify any specific speech of theirs that was chilled as a result of Dr. Marlatt's directives, and certainly no speech within the four protected categories identified by the Tenth Circuit.  There is some suggestion in the record, however, that the Teachers changed the location of meetings (where, I assume for purposes of summary

_____

[7]     As set forth in my Order in the Dillon case, I note Plaintiffs on remand attempted to expand their prior restraint arguments premised on the "code" beyond *NTEU* and any balancing of employer/employee interests to invoke a strict judicial scrutiny test under *New York Times v. Sullivan*. By characterizing the promise to refrain from "malicious gossip and similar activities" the code extracted as a sort of legislative prohibition against speech so "sweeping" and so "vague" that the Teachers ten years later remain "afraid  to talk" and unsure "what they can say or not say, and whom they can associate with or not associate with, on their own time and in their own homes and churches," Plaintiffs urged me to declare it unconstitutional without reference to *NTEU/Pickering* in the absence of any "compelling state interest" for it.  *See* Pls.' Br. in Opp. (Doc. 100) at 20-21; Status Rep. (Doc. 88) at 2; Tr. of 5/9/08 Oral Argument at 28.

I rejected that argument on its face in my June 11 Order and will not repeat myself here. Beneath the rather shameless hyperbole ("nuclear weapon to kill a flea," "minions" punishing "any speech" they want "for the remainder of Teachers' lives," the Board using the Code to effect a "reign of terror" ), the fact is the provision was an employee disciplinary policy, not a legislative enactment; it is subject to *NTEU/Pickering* and not strict judicial scrutiny; it was a neither a "universal" nor "blanket" ban on "all speech"; and Plaintiffs identify no speech of theirs that was chilled as a result of it.

judgment, some protected speech occurred), staggered their departures and limited their communication with parents as a result of the "gag order."  Under these circumstances, where a reasonable juror could find that Dr. Marlatt's directives restricted Plaintiffs' protected speech, the *NTEU/Pickering* test applies.

The broader the governmental employer's ban on public speech, the greater its burden under the *Pickering* test to justify its actions as necessary to accomplish its public mission.  *See NTEU*, 513 U.S. at 468 (the government's burden is greater with respect to a statutory prohibition on speech than with respect to "an isolated disciplinary action"). In *NTEU*, the Supreme Court ruled the government had to meet a "heavy burden" in defending the Ethics in Government Act's blanket ban on federal employees' extra-curricular speaking and writing activities given the broad scope of the ban and the sweep of the speakers and audience affected.  *See id.* at 468 (government would be required to demonstrate the interests of both "potential audiences" and the "vast group" of affected employees in a range of expression were outweighed by that expression's necessary impact on the "actual operation of the government").  Here, where the restraints were disciplinary rather than prohibitory, comprised of specific verbal directives to a targeted group of employees rather than a statutory proscription applicable across all employee categories, and limited in scope (restricting only those targeted individuals' off-campus speech related to "school matters" rather than all speech), the concerns expressed in *NTEU* are mitigated significantly.

Moreover, even a broadly applicable ban will satisfy *NTEU*'s "heavy burden" if it

is tailored to speech on subject matters related to an employee's official duties. In *Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006), the Tenth Circuit upheld a Social Security Administration regulation prohibiting employees from receiving compensation for outside teaching, speaking or writing because the ban was limited to payment for activities "related to the employee's official duties." 446 F.3d at 1106 (quoting 5 C.F.R. § 2635.807(a)). In contrast, the Tenth Circuit explained, the Supreme Court in *NTEU* "emphasized that the honoraria ban applied even where there was no nexus at all between the employee's outside expressive activity and his employment." *Id.*

In the instant case, Plaintiffs acknowledge the nexus between Marlatt's directives and their employment by characterizing her "gag order" as a prohibition against meetings and speech related to "school matters." They also acknowledge the Academy's interest in maintaining the confidentiality of disciplinary proceedings and in complying with federal education privacy laws. To the extent the proscription against speaking on "school matters" captured both protected and unprotected speech (again, a premise for which there is no evidentiary basis), the Academy argues its interest in disciplining and managing its staff together with federal and state confidentiality mandates outweighs Plaintiffs' demonstrated First Amendment interests, if any.

Even under a summary judgment standard, the evidence is such that Defendants have the better position with respect to the ultimate outcome of the *NTEU/Pickering* balancing test. No ultimate decision on the merits is necessary, however, given my conclusions – some articulated in my June 11 *Dillon* Order and some expanded upon

below – that neither the District, the Academy nor Marlatt in her individual capacity may

be held liable under § 1983 for either constitutional deprivation alleged, even assuming

they survived summary judgment.

### B. § 1983 - Individual Liability - Dr. Marlatt - Qualified Immunity.

Section 1983 imposes civil liability only upon

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory,
> subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by
> the Constitution and laws  . . . .

"The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived

of a right 'secured by the Constitution and laws.'"  *Baker v. McCollan*, 443 U.S. 137, 140

(1979), *applied in Graham v. Independent School Dist. No. I-89*, 22 F.3d 991, 993 (10th

Cir. 1994).   Both individual governmental officials as well as entities may be "persons"

subject to liability to individuals upon whom they have visited constitutional deprivations.

*See Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).   Under the

doctrine of qualified immunity, however, officials acting within the scope of their

authority are shielded from individual liability for constitutional injuries they inflict if the

unconstitutionality of their conduct would not be apparent to a reasonable person in their

position.

Qualified immunity shields government officials performing discretionary

functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates

"clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is "'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 201 (2001)(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) and citing *Anderson v. Creighton*, 483 U.S. 635 (1987)). When a defendant asserts a qualified immunity defense in a § 1983 case, the burden shifts to the plaintiff to establish the prerequisites for liability. *Cortez v. McCauley* 478 F.3d 1108, 1114 (10th Cir. 2007)(citing *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir.2004)).

A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? *Cortez* at 1114 (quoting *Saucier* at 201). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id*. If, on the other hand, a violation has been shown, the plaintiff must then show that the constitutional right was clearly established. *See id.*

The dispositive inquiry for determining whether a right is clearly established "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Cortez* at 1114 (quoting *Saucier* at 202). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition...." *Id.* Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly

unlawful. *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

For purposes of summary judgment in this case, it has been established or will be presumed that Dr. Marlatt, through her actions in giving the Teachers negative reviews and in issuing her verbal directives against meeting and discussing school matters, retaliated against and restrained Teachers' First Amendment rights freely to speak about matters within one or more of the four categories of protected speech identified by the Tenth Circuit on appeal.[8] Dr. Marlatt's qualified immunity defense, then, turns on a determination of whether those rights were "clearly established" at the time and in the context of the circumstances that existed when she acted. Under any conceivable application of the standard, the answer to that is no.

To determine whether a right is clearly established, the Tenth Circuit looks to see if there was a Supreme Court or other Tenth Circuit decision on point, or the weight of authority from other circuits confirms the law to be as the plaintiff maintains. *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999). Though there need not be binding precedent precisely on point, the unlawfulness of a defendant's conduct must have been apparent in light of pre-existing precedent. *Id.* Plaintiff bears the burden of demonstrating a substantial correspondence between the conduct in question and the contemporaneous state of the law. *Hannula v. City of Lakewood*, 907 F.2d 129, 131 (10th Cir. 1990).

_____

[8] The Tenth Circuit determined Dr. Marlatt's other allegedly retaliatory conduct – her hostile demeanor towards the Teachers – "would probably not deter a reasonable person from exercising his or her First Amendment rights." *Brammer-Hoelter*, 492 F.3d at 1208.

1.      Level of Generality

The operation of the "clearly established" standard "depends substantially upon the level of generality at which the relevant legal rule is to be identified." *Anderson*, 483 U.S. at 639.  Broadly-conceived, the Teachers' right to meet and discuss matters of public concern free of interference from Dr. Marlatt is "clearly established."  The court in *Anderson*, however, specifically warned that such generalized characterizations of constitutional rights will eviscerate the standard of objective legal reasonableness unless tailored to the facts and circumstances confronted by the official in a given case.  *Id.* "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id*. at 640.

*Anderson* involved a warrantless search of a family home where law enforcement officers thought a bank robbery suspect was hiding.  *Id*. at 637.  The Court held that the Eight Circuit erred when it concluded that qualified immunity was not available because the right to be free from warrantless searches--unless the searching officers have probable cause and there are exigent circumstances--was clearly established.  *Id*. at 640-41. Rather, the relevant question was "whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law *and the information the searching officers possessed*."  *Id*. at 641 (emphasis added).  Thus, the test for whether a right is clearly established depends not just on whether a plaintiff can identify a law that was allegedly violated, but on whether it was unreasonable under the circumstances for government officials to believe their particular conduct was lawful.

*Anderson*, 483 U.S. at 641.

Here, Teachers characterize Marlatt's directives as a "complete ban" on "all off-campus speech" on "all topics" (Br. at 16-18, 20) and conclude "any American citizen [employed as a school principal] would have known" such a ban was unconstitutional. *Id.* at 26. The argument depends both on overstatement – there is no evidentiary support for the characterization in the record – and a level of generalization that runs contrary to *Anderson*.

2. Evolving legal standard.

In the forty years since *Pickering*, moreover, the law applied to distinguish between protected and unprotected governmental employee speech has been refined and modified repeatedly, including during the pendency of this case.[9] The test itself is nuanced and requires assessments that are often subjective or subject to debate. In my original opinion on summary judgment, for example, I applied a series of Tenth Circuit *Pickering*-based cases to conclude that at their core, the numerous categories of speech the Teachers claimed were unconstitutionally infringed were all focused on "mak[ing] the school a better place" and were therefore not of "public concern." Mem. Op. & Order, slip op. at 9. After a lengthy exposition on the impact of *Garcetti* on the applicable legal standard, the Tenth Circuit applied those same cases to disagree that "all" of the

---

[9]     The Supreme Court's *Garcetti* decision, for example, was issued during the pendency of the appeal in this case and "made clear" the four-step *Pickering* test was now a five-step test requiring courts first to weed out speech made pursuant to a governmental employee's official duties and assess only the remainder for public concern status. *Brammer-Hoelter*, 492 F.3d at 1202-03, n. 4.

Teachers' speech was internally focused and therefore unprotected, identifying four subjects out of the "dozens" posited that arguably, under a summary judgment standard, qualified as matters of public concern. 492 F.3d at 1199-1206. In doing so, the Tenth Circuit rejected my unitary approach to the Teachers' speech and opted for an individualized analysis where each instance of asserted protected speech would be balanced separately. *See id.* at 1205 (applying *Johnsen v. Indep. Sch. Dist. No. 3*, 891 F.2d 1485, 1491 (10th Cir. 1989) and discussing "unitary" versus "individualized" evaluations in discerning protected speech). The "clarity" of the law of which Marlatt is charged with being "reasonably" aware, or the reasonableness of expecting her, at the time she acted, to apply it, is hardly apparent in the Tenth Circuit's analysis. In fact, the Court's nuanced and multi-tiered analysis suggests the opposite.

I conclude Dr. Marlatt is entitled to summary judgment on the Teachers' First Amendment retaliation claims against her on grounds of qualified immunity. The law that would inform a reasonable official in Dr. Marlatt's position that the speech and association activities she sought in her oral directives to restrict were protected, so that her actions in restraining them and evaluating the Teachers negatively for engaging in them might be unconstitutional, was not clearly established at the time she acted.

## C. § 1983 Municipal Liability - The District and the Academy.

Finally, I address the District and the Academy's Motions for Summary Judgment and their arguments that neither is subject to municipal liability for Dr. Marlatt's actions.

I wrote in some detail on the issue of municipal liability in these related cases in

my June 11, 2008 Order in the *Dillon* case. Under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) and progeny, local governmental entities are "persons" theoretically answerable for constitutional deprivations inflicted on its citizens, but are not answerable for the constitutional transgressions of their employees under a theory of *respondeat superior*. *Monell* at 690-91. Instead, a governmental entity is liable only for constitutional injuries caused by it own "official policy." *Id.* Under *Monell* and progeny, actions constituting "official policy" include (1) the formal act of promulgating a regulation or making a policy statement that deprives individuals of their constitutional rights (or having an informal "custom"[10] or practice that achieves the same unconstitutional result), *Monell* at 690-91; (2) the acts of subordinates who have been delegated "final policymaking authority" (or the ratification by final policymakers of acts of a subordinate to whom authority was delegated subject to those policymakers' review and approval),[11] *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986) *and City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-127 (1988); and under certain circumstances

---

[10]     I note the "custom" approach to establishing an unconstitutional official policy of a governmental entity requires more than an assertion of the same. The standard is high, requiring proof of "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Praprotnik*, 485 U.S. at 127 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970) and holding *Monell* did not alter that standard).

[11]     The authority to make municipal policy is necessarily the authority to make *final* policy. *Praprotnik* at 127 (emphasis mine). When a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. *See id.*

(3) the failure adequately to train or supervise employees who cause constitutional injuries to citizens as long as that failure rises to the level of "deliberate indifference" to those injuries.  *City of Canton v. Harris*, 489 U.S. 378, 388-91 (1989).

The Teachers urge each of these as grounds for holding the District and/or the Academy liable for their constitutional injuries.  Several fail summarily, and will not be given lengthy consideration here.  For example, Plaintiffs' assertion that the Academy's code of conduct was an "official policy" of the Academy that caused them constitutional injury fails for several reasons, but certainly also based on my determination that no constitutional injury occurred.  Similarly, any assertion that the "code," or Dr. Marlatt's actions alone, are evidence of an entity-wide "custom" or "practice" of prior restraint or First Amendment retaliation is insufficient to withstand summary judgment.  *See Praprotnik* at 127.  The conduct at issue must be "widespread" to be actionable, and "so permanent and well settled" as to constitute the policy of the entity over time. *Id.* (quoting *Adickes*).  Plaintiffs fail even to allege facts that would support a finding of a "custom" under this standard, and there is no factual basis in the record to support one.

I have also already rejected Plaintiffs' "deliberate indifference" theory of municipal liability under *Canton v. Harris*, observing it conflated concepts of individual (supervisor) and municipal liability and ruling the "deliberate indifference" standard applies only in cases where the constitutional injury is the result of the entity's failure adequately to train or supervise an employee who goes on to inflict constitutional harm.

*See* Order at 9-10.[12]  Plaintiffs do not allege their injuries were the result of any failure on the part of the Academy or District to train or supervise Dr. Marlatt, and even if they did, the evidence is insufficient to create the requisite inference of deliberate indifference.  *See id.*

Accordingly, the Teachers' theories of municipal liability against the Academy are limited to their assertions that (1) Dr. Marlatt was an official policymaker whose actions are the actions of the Academy under *Monell* or *Pembauer* or (2) the Academy ratified Dr. Marlatt's actions under circumstances where it had retained final authority to review and approve them under *Praprotnik*.  With respect to the District, Plaintiffs' only remaining theory of municipal liability is that the District retained final policymaking authority over employment decisions of the Academy and therefore necessarily ratified the Academy's actions vis á vis Teachers.

1.      Dr. Marlatt as "official policymaker."

*Monell*'s "'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469 at (1986).  Thus, only officials with "final policymaking authority" may subject a government entity to § 1983 liability.  *Id*. at 482-83.  The identification of policy making officials is a question of state law.  *Praprotnik*,

---

[12]      *Canton* supports the imposition of municipal liability under limited circumstances where a failure to train is tantamount to deliberate indifference to the constitutional injuries those employees inflict.  Order at 9, *citing Canton*, 489 U.S. at 387-88.

485 U.S. at 124.

Colorado law and the Academy's bylaws indicate that the Board had complete responsibility for running the Academy, and the Teachers have produced no evidence that Dr. Marlatt was a final policymaker for the Academy. By statute, a Colorado charter school "shall be administered and governed by a governing body in a manner agreed to by the charter school applicant and the chartering local board of education." C.R.S. § 22-30.5-104(4) (2007). The charter contract provides that the Board "has complete responsibility for running the school" and that the administrator's (i.e., Dr. Marlatt's) role is advisory. (Pls.' Ex. 2, Charter School Application, p. 2.) Dr. Marlatt's employment contract describes her duties as providing "instructional, planning, conference, in-service and administrative services"; it does not contain any reference to making policy for the Academy. (Pls.' Ex. 37, Administrator Employment Contract, p. 1.) The Teachers have identified no law, regulation or contract language tending to show Marlatt was a final policymaker for the Academy or District, and I reject the contention as a matter of law.

2.     Ratification of Dr. Marlatt's Conduct.

Alternatively, the Teachers argue the Academy and/or the District may be held liable for the unconstitutional acts of Dr. Marlatt because officials at both levels "knew" what Marlatt was doing and "authorized" her actions by virtue of doing nothing to stop her. As previously stated, a governmental entity may be liable for a subordinate's unconstitutional act if it delegates discretionary policymaking authority to that subordinate subject to the entity's final review and approval, and then gives that final

24

review and approval.  *See supra*, n. 11 (citing *Praprotnik* at 127).  Liability premised on

ratification is appropriate under *Monell* because retaining and then giving final approval

to the subordinate's act makes that act the act of the entity.  There is no evidence in this

case that the Board retained final authority to review and approve Marlatt's actions  or

that it actually gave such approval.  The only evidence offered by the Teachers to support

either proposition is Dr. Marlatt's "belief" that the Board authorized everything she did

(Marlatt Dep. 20:23-25) and her vague double negative that none of her acts were "not"

authorized by the Board.  *Id.* at 21:14-17.  These generalizations are insufficient to

support municipal liability under a theory of ratification.  *See Praprotnik* at 130 ("Simply

going along with discretionary decisions made by one's subordinates . . . is not a

delegation to them of the authority to make final policy.")

     The Teachers' ratification theory with respect to the District is even more

attenuated because it is premised not on any retention of authority to review and approve

Dr. Marlatt's actions, but on the retention of authority to review and approve "personnel

decisions" of the Board.  Specifically, the Teachers invoke the Academy's charter, which

provides that, "[p]rior to terminating an employee, the [Academy] shall notify the

[District] Assistant Superintendent of Auxiliary Services for review to ensure that all due

process obligations have been met" (Pls'. Ex. 2, p. 21), to argue Assistant Superintendent

Bob Moderhak "approved" the personnel actions taken against them.  The argument bears

multiple fatal flaws.

     First, the constitutional deprivations at issue are Dr. Marlatt's acts in restraining

Teachers' speech and association rights and/or retaliating against them for exercising those rights, not any termination decision by the Board. Moreover, the Tenth Circuit specifically affirmed the determination that the Teachers were not terminated, but voluntarily resigned their employment. Second, there are no facts in the record that would support any assertion that the District had or retained any authority vis á vis Marlatt, or that any final policymaker for the District reviewed or approved anything Marlatt did. Plaintiffs' ratification theory for holding the District liable for the acts of Marlatt is a non-starter. There are no grounds to hold the District liable under the facts and circumstances of this case for any acts of prior restraint or First Amendment retaliation by Marlatt.

## CONCLUSION.

In the wake of the Tenth Circuit's decision on appeal and order for remand, the parties were granted leave to supplement their briefing on the various Motions for Summary Judgment that had previously been granted. After briefing, the Motions were set for oral argument and oral argument was heard. Based on findings and conclusions set forth above, I rule on these Motions as follows:

1. Defendant St. Vrain Valley School District's Supplemental Motion for Summary Judgment (Doc. 90) is **GRANTED**. Plaintiffs have articulated no viable theory of municipal liability to hold the District liable for either of the constitutional deprivations that arguably survive scrutiny under a Fed. R. Civ. P. Rule 56(c) summary judgment standard.

2.  The Academy's Supplemental Motion for Summary Judgment (Doc. 91) is also **GRANTED**.  Dr. Marlatt was not a final policymaker of the Academy, her acts cannot be attributed to the Academy under any theory of municipal liability identified in *Monell* or its progeny, and the Teachers' evidence is insufficient to demonstrate that the Academy maintained a long-standing custom or policy of prior restraint or First Amendment retaliation sufficient to subject it to liability for the constitutional deprivations at issue.

3.  Dr. Marlatt is entitled to qualified immunity for any constitutional deprivations that flowed from her actions in restraining Plaintiffs' rights with regard to the four protected subject matters at issue and/or in retaliating against them for exercising those limited rights and her Supplemental Motion for Summary Judgment (Doc. 92) is also **GRANTED.**

Based on the foregoing, summary judgment shall enter in favor of Defendants and against Plaintiffs on each of Plaintiff's remaining 42 U.S.C. § 1983 claims in this case.


Dated August 25, 2008.                              **s/John L. Kane**
                                                     SENIOR U.S. DISTRICT JUDGE